Filed 1/12/23  Flaherty v. Carasi CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| KENNETH FLAHERTY,<br><br>   Plaintiff and Appellant,<br><br>v.<br><br>JODY ANN CARASI,<br><br>   Defendant and Respondent. | 2d Civ. No. B315777<br>(Super. Ct. No. FL01-0685)<br>(San Luis Obispo County) |

Kenneth Flaherty and Jody Ann Carasi (formerly Flaherty) were married.  When they separated, they entered into a marital settlement agreement (MSA) that was incorporated into a final judgment of dissolution in 2001.  The MSA purported to divide one community asset, Flaherty military retirement pension, which had not yet vested.  The MSA also established payments Flaherty was obligated to make as child support.

Flaherty stopped making some of the child support payments in 2002 and he retired and began receiving his military pension in 2008 without informing Carasi.

When Carasi discovered Flaherty had retired she filed a request for orders to apportion the pension and recover arrears and later filed a request for orders to enforce the child support payments.

The trial court found Carasi was entitled to both her one-half share of the community interest in the pension, including arrears, and past due and unpaid child support. The court also found Flaherty breached his fiduciary duty by keeping Carasi's portion of the pension.

Flaherty appeals. We affirm the trial court in all respects.

I.    FACTUAL AND PROCEDURAL HISTORY

Carasi and Flaherty married on October 8, 1988. They have one child, Amanda, born in 1990. They separated after twelve years of marriage on October 1, 2000.

Flaherty enlisted in the military in June 1988. During their marriage, the parties anticipated and discussed numerous times that Flaherty had aspirations to stay in the military until he achieved the rank of Admiral which was expected to take more than 20 years. He would not be entitled to receive his pension unless he remained with the military for a minimum of 20 years.

After separating, the parties entered into the MSA drafted by a paralegal. Neither party had an attorney. The MSA was incorporated into the final judgment of dissolution on October 4, 2001.

In the MSA the parties stipulated to above-guideline child support where Flaherty was obligated to pay the following amounts: "[A]s for child support, Husband shall pay to Wife a total of $700.00 per month . . . . In addition to support, Husband agrees to finish paying for Child's 'GET' college tuition program which is $183.00 a month and child's educational IRA at $41.66 a

month.  Total child support obligation shall be $925 per month. Support shall continue for child until said child dies, marries, becomes self-supporting, reaches 19, or reaches 18 and is not a full-time high school student, whichever occurs first.  If child is enrolled in college, support in the amount of $700 will continue until child reaches the age of 22."

With respect to Flaherty's military pension, the MSA stated:  "If/when Husband retires from military services spouse will be entitled to retirement pay benefits.  The entitlement, of wife shall be calculated from October 8, 1988 to October 1, 2000."

The MSA also contained the following clause:  "The parties acknowledge that the court shall have jurisdiction to make whatever orders may be necessary or desirable to carry out this agreement and to divide equally between the parties any community assets or liabilities omitted from division under this agreement."

Flaherty stopped funding the GET college tuition fund in 2002.  The account was closed and the money was sent to Flaherty.  He kept the money.  Flaherty also stopped making payments to the IRA in 2002 and stopped paying $700 child support when Amanda turned 18.

In 2008, when she was 18 years old, Amanda married.  She enrolled in college in the Fall of 2008.  Carasi has known since 2005 that Flaherty stopped paying into the GET and educational IRA accounts.

Flaherty retired from the military on July 1, 2008.  He began receiving all the retirement benefits, including Carasi's portion.  Although he knew he was receiving Carasi's portion, he did not notify Carasi or anyone else of this fact.

Carasi, as the non-military spouse, had an affirmative duty under the applicable federal military requirements to complete all paperwork necessary to partition the military retirement pension account (MRA). Carasi has never, until now, submitted the necessary paperwork to begin receiving her portion of the pension.

Until these proceedings began, Carasi and Flaherty had not had any contact since 2005. Carasi discovered Flaherty had retired when she and Amanda conducted an internet search in 2019.

On July 5, 2019, Carasi filed a request for orders (RFO) for approval of a military retirement apportionment order. In that request Carasi also sought determination and payment of the arrears on the military pension.

On December 6, 2019, Carasi filed a second RFO to enforce the provisions of the MSA regarding the GET education account, the educational IRA contributions and adult child support of $700 per month owed while Amanda attended college between the ages of 18 and 22.

The trial court took evidence on both RFOs and issued a proposed and then final statement of decision which included some of the factual findings mentioned above. The court also found that although neither Flaherty nor Carasi was entirely credible, Flaherty was less credible than Carasi.

The court made various additional findings and orders including the following: 1) the MRA was not an omitted/unadjudicated asset; 2) Flaherty breached his fiduciary duty by keeping Carasi's portion of his retirement; 3) Flaherty owes arrears for adult child support of $700 per month for the period of time when Amanda attended college between 18 and 22 years of

4

age; and 4) Flaherty owes Carasi for unpaid GET and IRA contributions due before Amanda married as well as the amounts that were in these accounts when he stopped payments.

The precise amounts owed for pension arrears, current pension distribution, adult child support, and GET and IRA payments, together with interest, remain to be determined.

The trial court found that because Flaherty breached his fiduciary duty to Carasi, under Family Code section 1101 subdivision (g)[1] he was ordered to pay Carasi $10,000 for attorney's fees and the apportionment of the MRA would be based upon Flaherty's average high three years of income at the date of retirement.

## II.    DISCUSSION

### A.    *Standard of Review*

A marital settlement agreement incorporated into a stipulated judgment is interpreted under the general rules governing the interpretation of contracts.  (*In re Marriage of Schu* (2014) 231 Cal.App.4th 394, 399.)  "Where no extrinsic evidence is introduced, or the extrinsic evidence is not in conflict, we independently construe the agreement.  [Citation.]  Where competent extrinsic evidence is in conflict, we uphold any reasonable construction by the lower court."  (*Ibid.*)

### B.    *The Trial Court Had Jurisdiction to Make Necessary Orders Regarding the MRA*

Flaherty appeals the trial court's decision regarding the pension because he claims it did not have jurisdiction to divide the MRA.  He states "the community estate must be divided at

---

[1] Unless otherwise stated, all statutory references are to the Family Code.

5

the time the judgment for dissolution is entered unless the court expressly reserves jurisdiction to divide an asset at a later time."

Flaherty contends that the MRA was not "divided" because "[w]hether by design of the parties or merely oversight" the MSA did not indicate whether the pension would be divided using the "in kind" or the "cash out" method. He also contends the trial court "specifically found that the MRA had not been divided." We disagree.

The MSA clearly divided the MRA using the "in kind" method. With an "in kind" division the trial court retains jurisdiction to later implement the division as benefits become payable. (*In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 518 citing *In re Marriage of Brown* (1976) 15 Cal.3d 838, 848-849.) The trial court's decision to use the "time rule"[2] to calculate the community portion of the MRA reflects that it too found the MSA used the "in kind" method. (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 750.) [when a community pension is divided in kind, courts usually use the time rule to allocate separate and community interests].)

Flaherty also argues that because the MRA was not "divided" when the judgment was entered, the general reservation of jurisdiction in the MRA is ineffective to empower

---

[2] Under the "time rule" the "community property interest in retirement benefits is the percentage representing the fraction whose numerator is the employee spouse's length of service during marriage before separation, . . . and whose denominator is the employee spouse's length of service in total, . . . the separate property interest is the percentage representing the remainder of 100 percent minus the community property interest percentage." (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 176, italics omitted.)

the court to divide it now.  We agree a court cannot modify a final judgment dividing a community asset unless it expressly reserves jurisdiction to do so (*In re Marriage of Curtis* (1989) 208 Cal.App.3d 387, 391) but the trial court's orders did not modify the MSA.  The MSA divided the MRA "in kind," and the MSA expressly authorized the court to "make whatever orders may be necessary or desirable to carry out this agreement."  The court's orders merely carried out the division of the MRA as the parties intended.  (See *In re Marriage of Bergman, supra,* 168 Cal.App.3d at p. 755, fn. 10 [judgment can reserve jurisdiction to supervise future payments when benefits are received].)

C.     *The Trial Court Properly Enforced the $700 per month adult child support*

The trial court found the MSA required Flaherty to pay adult child support of $700 per month for every month Amanda attended college between the ages of 18 and 22.

Flaherty argues Carasi should not recover these arrears because she failed to declare what was owed pursuant to section 5230.5 which states "Any obligee alleging arrearages in child support shall specify the amount thereof under penalty of perjury."[3]  Flaherty cites no authority for his contention that failure to specify an amount precludes recovery and we can discern no basis for doing so.

Flaherty also argues the $700 payable after Amanda turned 18 was not child support but a contractual obligation and

---

[3] Carasi contends Flaherty waived this argument by failing to raise it in the trial court.  However, Flaherty did raise this issue in his supplemental trial brief.

thus subject to the defense of laches.[4]  Flaherty does not cite any authority for the proposition that an agreement to pay child support incorporated into a judgment remains enforceable only as a contract.  Parties can stipulate to a court order to pay adult child support and once the agreement becomes a court order it is subject to the rules governing child support, generally. (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 947 [child support agreement incorporated order deemed court-imposed rather than contractual]; § 3587.)  The trial court properly found $700 payable after Amanda reached 18 until she turned 22 was child support.  The defense of laches is not available for unpaid child support not owed to the government under section 291, subdivision (d).  (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1177.)

Finally, Flaherty argues the adult child support terminated by operation of law when Amanda married.  He cites generally sections 3900 and 3901 but he ignores both section 3901, subdivision (b) which expressly does not limit a parent's ability to agree to pay additional child support and section 3587 which expressly authorizes parents to agree to pay adult child support.

### D.  GET and IRA Were Additional Child Support

The trial court found the GET and educational IRA payments were child support "add-ons" and ordered Flaherty to pay Carasi the arrears and the amounts he withdrew from the accounts.

Flaherty argues the GET and IRA payments are not child support because they are "incomplete."  He objects because the

---

[4] Flaherty argues because the adult child support was a contractual obligation "Family Code § 215 should not apply."  We presume he means section 291.

MSA language where he "agrees to finish paying for Child's 'GET' college tuition program . . . and child's education IRA . . ." cannot be enforced because there is no beginning or end date, and no explanation what "finish" means.

The MSA terms are vague, as the trial court noted, but the trial court reasonably interpreted them. (*In re Marriage of Schu*, *supra*, 231 Cal.App.4th at p. 399 ["Where competent extrinsic evidence is in conflict, we uphold any reasonable construction by the lower court"].)

Flaherty testified the GET and IRA accounts were established "way before our divorce and way before our separation." The MSA stated the Flaherty agreed to "finish paying" the GET and IRA payments and that the "[t]otal child support obligation shall be $925 per month" which is $700 per month plus the GET and IRA payments. The MSA states "Support shall continue . . . until [Amanda] dies, marries, becomes self-supporting, reaches 19, or reaches 18 and is not a full-time high school student, whichever occurs first."

The trial court reasonably interpreted the language to mean payments of $925, which included the GET and IRA payments, continued until Amanda emancipated – in this case when she married. The trial court also properly determined that the GET and IRA payments were intended to be additional child support. The parties could and did agree to non-guideline additional child support. (§ 3901, subd. (b).)

Like the adult child support he agreed to pay, Flaherty cannot rely upon laches as a defense for non-payment of the GET and IRA additional child support payments. (§ 291, subd. (d).)

We have considered Flaherty's other objections to the trial court's decision regarding the GET and IRA payments and are

not persuaded the trial court erred.  The payments are not governed by sections 4061 and 4062 which concern the trial court's authority to order mandatory and discretionary additional child support.  Parties can agree to a non-guideline amount of child support (§ 4065, subd. (a)) which in this case is what Flaherty and Carasi did – they agreed to include in the total child support amount the GET and IRA payments.

*E  Section 1101, Subdivision (g) Remedies Were Proper*

Flaherty objects to the trial court's ordering him to pay $10,000 for attorney's fees to Carasi as a remedy for his breach of fiduciary duty pursuant to section 1101, subdivision (g).  The court found Flaherty breached his fiduciary duty when he began to receive Carasi's portion of the MRA without telling her, without taking any action to inform the pension payor, and he did not set the funds aside for Carasi.

A former spouse owes a fiduciary duty to his former spouse until the community asset is finally distributed (§§ 2101, subd. (a) & 2102, subd. (b)).  "This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."  (§ 721, subd. (b).)

Flaherty argues he did not breach his fiduciary duty because there was no evidence he transferred any community asset.  Section 721 does not delineate all the ways in which a spouse may breach his duty. (§ 721, subd. (b), italics added ["This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, *including, but not limited to, the following . . .*"].)

10

Flaherty knew he was receiving Carasi's share of the pension. He took no action whatsoever to protect her interest in those funds and instead kept her portion. Substantial evidence supports the trial court's finding that Flaherty breached his fiduciary duty and the court was well within it discretion to award Carasi $10,000 in attorney's fees and in establishing the highest value of each separate pension distribution at the time of receipt per section 1101, subdivision (g).[5]

Finally, Flaherty contends because Carasi failed to plead he breached his fiduciary duty in her RFOs, the court erred in making that determination. We find nothing in the language of sections 1100 or 1101, nor in any authority cited by Flaherty, that so limits the trial court's discretion. But even if the trial court's discretion were so narrowly circumscribed, Flaherty has not shown or even attempted to show prejudice. It is true Carasi's RFOs did not specifically allege Flaherty breached his fiduciary duty, but she did allege the underlying facts relied upon by the court to make that determination. Flaherty had an opportunity in the trial court to address the claim, which he did in his supplemental trial brief, his closing argument brief, and his objections to the proposed statement of decision. Having made no attempt to demonstrate prejudicial error, Flaherty has forfeited the issue as a basis for appellate relief. (*Vought Construction Inc. v. Stock* (2022) 84 Cal.App.5th 622, 630, fn. 7; *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 829, fn. 4.)

---

[5] In calculating a remedy for a breach of the fiduciary duty the value of the community asset shall be determined to be either its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court. (§ 1101, subd. (g).)

## III. DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal.

NOT TO BE PUBLISHED

CODY, J.*

We concur:

GILBERT, P. J.

YEGAN, J.

---

* Judge of the Ventura Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California constitution.

Erin Childs, Commissioner
Superior Court County of San Luis Obispo

_____

Gillett Law, Gregory F. Gillett, for Plaintiff and Appellant.
Paul Kujawsky, for Defendant and Respondent.