Filed 8/16/24  In re S.A. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re S.A., a Person Coming Under the Juvenile Court Law. | B331365, B323792, B321528 |
| _____ | (Los Angeles County Super. Ct. No. 19CCJP00325A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| PATRICIA A., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  B331365, affirmed; B323792, affirmed as modified; B321528, dismissed.

Patricia A., in propria persona, for Defendant and Appellant.

Law Office of Amir Pichvai and Amir Pichvai for Plaintiff and Respondent.

_____

Patricia A. appeals from three of the juvenile court's orders pertaining to the juvenile dependency case for her biological son, Samuel A.

In the first of the three appeals, B323792, Patricia contends the court issued an overbroad restraining order under Welfare and Institutions Code[1] section 213.5 protecting Samuel and his foster parents. The second appeal, B321528, concerns the juvenile court's summary denial of Patricia's section 388 petition filed on June 6, 2022, seeking additional reunification services and visitation with Samuel. In the third appeal, B331365, Patricia challenges the order terminating her parental rights pursuant to section 366.26.

We affirm the order terminating Patricia's parental rights. We dismiss as moot Patricia's appeal from the denial of the 388 petition. Because we agree the restraining order was, in part, overbroad, we modify it and affirm the order as modified.

### FACTS AND PROCEDURAL BACKGROUND[2]

The dependency case involving Samuel stems from a petition filed by the Los Angeles County Department of Children

---

[1]     Further references to code sections are to the Welfare and Institutions Code, unless otherwise stated.

[2]     We recount only those facts and portions of the procedural history that are pertinent to the issues before us. Extensive discussions of the factual and procedural history, pre- and post-disposition, can be found in the earlier decisions *In re Samuel A.* (2020) 55 Cal.App.5th 1; *In re Samuel A.* (2021) 69 Cal.App.5th 67; and *In re Samuel A.* (Nov. 14, 2022, B316997, B317751, and B318877 [nonpub. opn.]); see also *In re Samuel A.* (Dec. 6, 2021, B312480 [nonpub. opn.]) and *In re Samuel A.* (Dec. 6, 2021, B310032 [nonpub. opn.]).

and Family Services (DCFS) on January 16, 2019, when Samuel was approximately two and a half years old. The case spans over five years of proceedings, during which time Patricia had at least 10 different attorneys and filed 13 appeals or petitions for writ relief, not including the three appeals before us now.

On March 20, 2019, the juvenile court took jurisdiction over Samuel pursuant to section 300, subdivision (b)(1), finding Patricia's unresolved history of alcohol abuse left her unable to care for Samuel; Patricia suffered from untreated mental health issues, including anxiety and depression; Patricia self-medicated with alcohol to alleviate her suffering; and Patricia's alcohol abuse and untreated mental health issues placed Samuel at substantial risk of serious physical harm. (*In re Samuel A.* (Nov. 14, 2022, B316997, B317751, and B318877 [nonpub. opn.].)

The court declared Samuel a dependent child of the court and removed him from Patricia's custody, finding by clear and convincing evidence there would be substantial danger to Samuel's physical health and safety if he were returned to Patricia. The court placed Samuel in the care and custody of DCFS and ordered family reunification services for Patricia.[3]

Reunification efforts were not successful.

After several years of proceedings before the juvenile court and this court, the juvenile court terminated Patricia's reunification services on February 23, 2022, following a contested hearing. The court set the matter for a hearing pursuant to

---

[3] Samuel's father was never identified in these proceedings; Patricia contends Samuel was conceived using an anonymous sperm donor.

3

section 366.26 to select and implement a permanent plan for Samuel.[4]

On September 16, 2022, the court granted a three-year restraining order against Patricia protecting Samuel and his foster parents.

On June 6, 2023, the court summarily denied Patricia's section 388 petition seeking to reinstate reunification services and visitation with Samuel.

On August 16, 2023, the juvenile court terminated Patricia's parental rights and set adoption as the permanent plan for Samuel following a contested section 366.26 hearing.

Patricia timely appealed all three orders.

This court granted Patricia's motion to represent herself in all three appeals. She filed her opening brief in B331365 in propria persona, but her previously appointed counsel filed opening briefs on her behalf in B321528 and B323792, before Patricia sought to represent herself. Patricia did not avail herself of the permission we gave her to file supplemental opening briefs in the latter two cases, but she filed reply briefs in propria persona in all three appeals.

We denied DCFS's request to consolidate the three separate appeals but ordered they could be considered concurrently for the purposes of oral argument and decision.

---

[4]    On November 14, 2022, we denied Patricia's petition for extraordinary writ relief from the juvenile court's order terminating her reunification services, setting a selection and implementation hearing, and denying her visitation. (*In re Samuel A.*, *supra*, B316997, B317751, and B318877.)

## DISCUSSION[5]

### 1. *Restraining Order*

Patricia contends the juvenile court granted a restraining order that was not narrowly tailored and infringes her First Amendment rights in its prohibition on social media postings regarding Samuel and his foster parents.

### A. Procedural history

On June 23, 2022, DCFS filed a request for restraining order on behalf of Samuel and his foster parents. In addition to 500-yard stay away and no contact orders and an anti-

---

[5] We decline to address Patricia's forfeited arguments that (1) are not presented under a separate heading in her opening briefs; (2) are not supported by legal authority as well as appropriate citations to the record; or (3) are raised for the first time in her reply briefs. (*Barber Group, Inc. v. New Motor Vehicle Bd.* (2023) 93 Cal.App.5th 1025, 1036, fn. 4 [issues discussed but not identified by a separate heading are forfeited; arguments raised for the first time in reply are generally forfeited]; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 ["[A]n appellant must not only present an analysis of the facts and legal authority on each point made, but must also support arguments with appropriate citations to the material facts in the record. If he fails to do so, the argument is forfeited."].) Patricia filed reply briefs in B321528 and B323792 that purport to correct alleged factual and procedural inaccuracies in the opening briefs filed by her court-appointed appellate counsel in those appeals. However, we may not consider those purported corrections because (1) new issues may not be raised on reply and (2) Patricia failed to provide citations to the record to support her alleged corrections. As noted, Patricia did not file supplemental opening briefs in B321528 and B323792.

harassment order, DCFS requested the juvenile court order Patricia not to "post or cause to be posted any postings, messages, comments, photographs, videos, or other information pertaining to the foster parents, or either of them, and to the child on any social media account."

The request alleged that Patricia "has accused the foster father of child stealing and trafficking as well as child abuse on her social media page, and has included a link to the foster father's LinkedIn account . . . .  Such reckless accusations cause the foster parents serious damage and loss of reputation in their personal and business communities, and impact their ability to peacefully care for the child, potentially jeopardizing the placement of the child in their home, much to the child's detriment."  The request further alleged Patricia "has refused to take down social media postings depicting the child in violation of the court's orders of December 17, 2021. . . .  Such failure on the part of Patricia [] constitutes a violation of the child's right to privacy and right to confidentiality of these dependency proceedings, and has the potential for divulging private information to the public much to the child's humiliation and further detriment."

With the request, DCFS submitted copies of social media postings by Patricia.  These included a May 25, 2022 post by Patricia in a Facebook group titled "Pasadena Moms," in which Patricia shared the LinkedIn page of the foster father, identifying him by name.  Patricia's post stated, "This licensed California attorney is involved in child trafficking and abuse.  He signed up with what they name a FAA agency to steal children from happy and healthy families!  We won our appeals and we have the media rights!  Please get in touch with me for more information."

DCFS also submitted a minute order from December 17, 2021, ordering Patricia to remove all postings regarding Samuel and the foster parents and demonstrate proof of such removal to the DCFS caseworker.

DCFS also attached a JV-290 "Caregiver Information Form" completed by the foster mother, stating the foster mother discovered Patricia's May 25, 2022 post on June 8, 2022, when she logged in to the "Pasadena Moms" Facebook page, a private group for people in their local community. The foster mother stated she was "concerned these posts will be seen by someone in Sam's life, whether that is the parent of another student in his class, teachers, or school administrators. We are also concerned that this could pose a safety risk to Sam and all of us when we are out in public, in the community. Sam's photos are also displayed in numerous posts. Further, our names, location, and all other identifying information was supposed to be redacted and remain confidential throughout this case. Despite those protections . . . [Patricia] has clearly been able to identify and locate us." The foster mother also attached an article posted by Patricia on medium.com that included a YouTube link with a video of a visit between Patricia and Samuel, showing Samuel's face. The article also included a photograph capturing a portion of Samuel's genital area. The article included inflammatory accusations about attorneys, social workers, and others involved in Samuel's dependency case.

Samuel's counsel joined the request for a restraining order. His counsel contended that despite repeated admonishments by the court, Patricia had "disclosed underlying information about Samuel's dependency status, his likeness, pictures of intimate areas of his body, names of various professionals working with

7

Samuel, as well as unrelated (and incendiary) information about judicial staff and personnel."  Counsel further contended Patricia had violated multiple court orders prohibiting her from disclosing information that was confidential under section 827, which protects the juvenile case file and related information from disclosure to the public.  Samuel's counsel included a link to a TikTok video available on the internet that purportedly showed a "sobbing Samuel, visibly uncomfortable with being video-taped while being repeatedly prompted to give the mother a kiss, tell her that he loves her and misses her."

Patricia submitted a response to the DCFS request, acknowledging portions of her postings violated section 827 by disclosing confidential case information, but arguing she had taken the offending posts down and for some time refrained from posting similar offending content on her social media.  Further, she argued the requested order was unconstitutionally overbroad and violated her First Amendment rights.  Patricia argued she had a right to air general grievances about DCFS and the dependency system.  She suggested that if the court were to issue a restraining order, it should be narrowly tailored to order only that she not disclose on social media the names of the foster parents or any case information protected by section 827.

On July 28, 2022, the court granted the temporary restraining order protecting Samuel and the foster parents and set the hearing on the issuance of a permanent restraining order.

DCFS submitted additional exhibits in support of the restraining order request, including an October 2, 2019 DCFS report documenting that Patricia had made threats against Samuel's *former* foster father while in an agitated state, stating, "I just want to murder him; I just want to murder him; I want

8

him dead." The report also stated Patricia had located this former foster father's home address and accosted him there while Samuel was present. Due to growing safety concerns, Samuel was moved on an emergency basis to "respite care" and then ultimately placed with different foster parents. The report indicated that DCFS was "requesting that ALL information remain confidential so mother cannot find the minor or the current caregiver. All three moves for the child have been sudden and due to safety concerns from mother finding the foster home," despite safety precautions in place to prevent Patricia from locating the caregivers.

DCFS also requested the court take judicial notice of its October 3, 2019 restraining order naming Patricia as the restrained party and protecting the former foster father and the supervising social worker. That restraining order included the special order that Patricia "not disseminate or publish in any form, including but not limited to social media, any personal information, including but not limited to home addresses or photographs, of protected persons."

DCFS also submitted its report from January 12, 2022, stating that in August 2021, the new caregivers received an email from Patricia informing them that "she had started a Kickstarter, YouTube and Change.org petition in Sam's name. Shortly after receiving that email, the caregiver's social media was hacked and the account was taken off the private setting. There were then 23 comments on the caregiver's account and on some of caregiver's friend's accounts. These comments are believed to be from [Patricia] based on the fact that it appeared under her Instagram account with her photo appearing as the icon. The comments stated, 'They are wanting to steal my son.' 'My son is

9

held by these people in a fraudulent case.' Links to her YouTube page named Sam's voice, GoFundMe and Change.org were attached to each comment." In addition, DCFS reported Patricia "has pictures of Samuel on her social media accounts, which is in violation of his right to privacy and confidentiality. [Patricia] has posted videos on YouTube where she mentions the caregiver's names and stated that she hired private detectives and has people approach the caregivers on the streets."

In the same report, DCFS updated the court on its efforts to follow up with Patricia regarding the court's December 17, 2021 order that she take down all offending internet posts. The caseworker emailed Patricia on January 25, 2022, as follows: "[T]he court ordered you to demonstrate that all postings in the internet be removed and show such removal to the [caseworker]. [¶] Please let me know what you have done to comply with the court's orders." In response, Patricia emailed, in pertinent part: "The appellate court granted me media rights over my appeals that I won. If the court wants specific posts removed, the court needs to give us the specific web links and I have this reviewed by our lawyers." DCFS reported that a subsequent search by a caseworker revealed that Patricia's posts referencing Samuel's dependency case and including his photo were still available online.

On September 16, 2022, the hearing on the permanent restraining order went forward. Patricia's counsel indicated Patricia did not object to a "narrowly tailored" restraining order, including an order that she not engage in postings or comments about the foster parents and not violate the confidentiality requirements of section 827.

10

After admitting all the evidence submitted by the parties and taking judicial notice of the October 3, 2019 restraining order protecting the former foster father, the court issued a three-year restraining order under section 213.5, naming Samuel and the current foster parents as protected persons and listing Patricia as the restrained party.[6]

In its ruling from the bench, the court ordered Patricia to stay 500 yards away from the protected persons and to not attempt to find out where they lived. Patricia was prohibited from having any contact with the protected parties, direct or indirect, and was ordered not to harm, annoy, or molest them in any fashion, including by making unsubstantiated claims about them or harassing them on any kind of media, social media, or anywhere else. The court ordered Patricia could not post or disclose any confidential information about Samuel or the foster parents. The court stated Patricia retained the right to voice her opinion and complaints about DCFS and about how DCFS had treated her and her case, so long as "it is not threatening [to anyone] or in violation of any law." The court ordered Patricia not to publicize Samuel's likeness on social media or any other media.

The JV-255 "Restraining Order – Juvenile" that was filed on September 16, 2022, and that will expire on September 16, 2025, repeated the language in the temporary restraining order that Patricia was ordered not to "post or cause to be posted any postings, messages, comments, photographs, videos, or other information pertaining to the foster parents, or either of them,

---

[6]     We denied Patricia's petition for writ of mandate seeking relief from the order granting the restraining order.

11

and to the child on any social media account." The minute order additionally reflected the court's order that Patricia "take down all photographs of the child posted on social media, specifically the photograph showing the child's genitalia."

## B.    Applicable law

Section 827 prohibits dissemination of the juvenile case file and any information relating to its contents to anyone who is not specifically authorized to receive such confidential information. (§ 827, subd. (a)(4) ["A juvenile case file, any portion thereof, and information relating to the content of the juvenile case file, may not be disseminated . . . to a person or agency [not] authorized to receive documents pursuant to this section."]; see Super. Ct. L.A. County, Local Rules, rule 7.2(a)(4) ["A person or entity entitled to inspect and copy a juvenile case file may disseminate a document or information from that file only . . . to other persons or entities that are also entitled to inspect and copy the file"]; *In re B.F.* (2010) 190 Cal.App.4th 811, 818; *In re Tiffany G.* (1994) 29 Cal.App.4th 443, 450-451 (*Tiffany G.*).) The confidentiality provisions of section 827 are "intended to protect the privacy rights of the child" who is the subject of dependency proceedings. (§ 300.2.) Permitting a parent to disseminate confidential information about a minor's dependency proceedings violates the minor's constitutionally protected privacy rights under Article I, section 1 of the California Constitution, and a juvenile court may properly order a parent not to do so. (*Tiffany G.*, at p. 451.) An intentional violation of the confidentiality provisions of section 827 is a misdemeanor offense. (§ 827, subd. (b)(2)(C).)

Restraining orders issued pursuant to Welfare and Institutions Code section 213.5 serve important governmental purposes of protecting privacy rights in addition to preventing

12

violence and harassment.  (See *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1512; cf. *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412 [purpose of civil harassment orders under Code Civ. Proc., § 527.6 is "to protect the [protected person]'s right to pursue safety, happiness and privacy as guaranteed by the California Constitution"].)  "Under section 213.5, . . . a juvenile court has the authority to issue a restraining order lasting up to three years that protects a dependent 'child,' 'any other child in the household,' as well as 'any parent, legal guardian, or current caretaker of the child' from harassment by a parent.  (§ 213.5, subds. (a) & (d); Cal. Rules of Court, rule 5.630(a).)  A court may issue such an order if it finds that the person to be restrained has ' "disturbed the peace" '—that is, engaged in conduct that destroys a person's mental or emotional calm—of the person to be protected.  [Citation.]  Neither 'evidence' of prior physical abuse nor 'a reasonable apprehension of future physical abuse' is required."  (*In re Lilianna C.* (2024) 99 Cal.App.5th 638, 643-44; see, e.g., *Brittany K.*, at p. 1512 ["[p]articularly when considered in the larger context of [a parent's] relentless and unceasing attempts to remove the minors from their caregivers' home," juvenile court properly issued restraining order protecting dependent minor and caregivers where parent "surreptitiously searched out and located the confidential location of the foster residence, in violation of their intended privacy" and "proceeded to make defamatory accusations about the foster parents to school authorities and attempted to make unauthorized contact with the minors"; parent's conduct "unquestionably interfered with caregivers' attempts to stabilize and nurture their relationship with the goal of permanency and adoption"].)

In reviewing the issuance of a restraining order under section 213.5, " 'we view the evidence in a light most favorable to the respondent, and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination.  If there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed.' " (*In re Bruno M.* (2018) 28 Cal.App.5th 990, 996-97.)  "We engage in a further analysis when a restraining order is alleged to infringe on constitutional rights of expression." (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1226 (*Parisi*), overruled on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)  We review de novo whether a restraining order is overbroad or vague and thus unconstitutional.  (*Parisi*, at p. 1226; *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

" ' "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." [Citation.]  "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' [Citation.]  . . . [P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." [Citation.] . . .  "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." ' " (*Parisi*, *supra*, 5 Cal.App.5th at p. 1230; accord, *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 886.)  A restraining order prohibiting an individual from posting on social media may constitute an invalid prior restraint, depending on the

14

circumstances. (See *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 833.)

However, " 'an injunctive order prohibiting the repetition of expression that ha[s] been judicially determined to be unlawful [does] *not* constitute a prohibited prior restraint of speech' " and does not offend the First Amendment. (*Parisi*, *supra*, 5 Cal.App.5th at p. 1230, italics added; accord, *Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1153.) A juvenile court order that a parent not disseminate information deemed confidential under section 827 is thus not an invalid prior restraint. (*Tiffany G.*, *supra*, 29 Cal.App.4th at p. 451.)

Even if an injunction does not constitute an impermissible prior restraint, "a court must tread lightly and carefully when issuing an order that prohibits speech. . . . 'An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." [Citation.] In other words, the order must be tailored as precisely as possible to the exact needs of the case.' " (*Balboa Island Village Inn, Inc.*, *supra*, 40 Cal.4th at p. 1159; see *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 22 [injunction may not burden constitutional rights more than necessary to serve the significant governmental interest at stake]; *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 192 [restraining order's "incidental infringement" of speech "can be justified only to the extent that it is no broader or more restrictive than is necessary" to prevent harassment].)

15

### C. The restraining order's social media prohibition is overbroad

Patricia does not challenge the sufficiency of the evidence supporting the permanent restraining order. Rather, she contends the restraining order constituted a "prior restraint" on her speech and was "not narrowly tailored to merely address confidential records or information from the dependency case, or legitimate privacy concerns of the protected persons." At issue is the order prohibiting Patricia from "post[ing] or caus[ing] to be posted any postings, messages, comments, photographs, videos, or other information pertaining to the foster parents, or either of them, and to the child on any social media account." Patricia contends this order is overbroad, and that the court may not restrain her from "airing grievances" against the dependency system. Counsel for DCFS responds that the restraining order needed to be broadly phrased because, "[a]bsent an absolute strict order, [Patricia] cannot be trusted that she will self-regulate and exercise restraint in her postings." Counsel for DCFS also asserts that the restraining order does not prevent Patricia from exercising her First Amendment rights and "airing grievances" as to DCFS and Patricia's experiences so long as she does not address Samuel and his foster parents.

A restraining order that prohibits posting confidential juvenile case information protected by section 827 is not an invalid prior restraint, because there has already been a determination by the Legislature (and again specifically by the court here in prior orders) that such information may not be disclosed. (See *Tiffany G.*, *supra*, 29 Cal.App.4th at p. 452.) However, we examine whether the restraining order is overbroad

16

in that it encompasses speech that would not be prohibited by section 827 or otherwise should not properly be enjoined.

With respect to information regarding the foster parents, Patricia argues "the only social media content that was properly subject to restriction was the disclosure of the full names of the foster parents." However, any reference by Patricia to Samuel's foster parents, even without using their full names, would impart information related to Samuel's confidential juvenile case file. That is because Patricia has no relationship with the foster parents except by virtue of the fact that DCFS placed Samuel with them and the juvenile court designated them as Samuel's prospective adoptive parents. Any social media post or message by Patricia about them would necessarily fall within the ambit of confidential juvenile case information protected from disclosure by section 827, subdivision (a)(4). Patricia does not have a legitimate interest in publishing information or opinions about the foster parents that would outweigh the foster parents' privacy interests. Given Patricia's lengthy history of problematic behavior with respect to both the former and current foster parents (finding where they lived and coming to their homes, threatening them, hacking into their social media, and posting defamatory social media posts and messages about them related to Samuel's case), we agree with DCFS a bright-line rule is appropriate as to the foster parents. (See *People v. Borrelli* (2000) 77 Cal.App.4th 703, 716 [the right to free speech "does not include the right to repeatedly invade another person's constitutional rights of privacy and the pursuit of happiness through the use of acts and threats that evidence a pattern of harassment"].) Thus, the order is not overbroad in prohibiting

17

any mention on social media of Samuel's foster parents, even in generic terms and without using their names.

With respect to Samuel, however, we agree with Patricia that the social media restriction is problematic as worded, in that it prohibits any mention of Samuel, even if only by reference to her "son" or "child." Unlike her relationship with or knowledge of the foster parents, Patricia's relationship with Samuel obviously was not created by virtue of the dependency proceedings. Patricia should be able to post her feelings about, experiences with, and memories of her "son" or "child," so long as she does not divulge information protected under section 827 or otherwise run afoul of the law, even now that her parental rights have been terminated. The prohibition on posting anything about Samuel on social media is thus overbroad. (See *Molinaro v. Molinaro*, *supra*, 33 Cal.App.5th at p. 833 [while family court could lawfully order husband not to disparage his ex-wife in the children's presence, restraining order that prohibited husband from posting *any* information about his divorce case on Facebook was overbroad].)

The juvenile court's oral findings suggest it intended only to prevent Patricia from posting photographs, videos, location information, specific identifying information, or confidential dependency case information pertaining to Samuel on social media. That was a narrower prohibition than the language that was copied from the temporary restraining order and repeated on the permanent restraining order. Thus, the restraining order should be modified to prohibit Patricia from posting on social media any likenesses of Samuel (either photographs or videos), or any references to Samuel's full name, location, school, or specific

18

identifying information, as well as any information related to the confidential juvenile case file involving Samuel.

We reiterate, as did the juvenile court, that Patricia remains free to air her grievances about DCFS and her experiences with the dependency system, so long as she respects the prohibitions in the restraining order, refrains from disseminating any information relating to Samuel's dependency case file, and abides by all other laws, including protections against harassment.

### 2. *Due Process at Hearing Regarding Termination of Patricia's Parental Rights*

Patricia asserts her due process rights were violated at the section 366.26 selection and implementation hearing in three ways: (1) the court did not permit her to introduce an audio recording Patricia made of the visit with Samuel that was observed by experts conducting bonding studies for purposes of determining whether the parental-benefit exception to adoption applied; (2) Patricia was not permitted to testify at the hearing; and (3) Patricia's attorney did not subpoena witnesses and present evidence that Patricia believed was important.[7]

---

[7] Although Patricia contends in passing that both her substantive and procedural due process rights were violated, the crux of her argument is that she was precluded from testifying, subpoenaing witnesses, and presenting evidence at the section 366.26 hearing. Thus, her contentions allege violations of her right to procedural, not substantive, due process. Patricia does not challenge whether substantial evidence supported the juvenile court's determination that she did not demonstrate the parental-benefit exception applied. Accordingly, we do not

## A.    Procedural history

The section 366.26 hearing to consider the permanent plan for Samuel was held on August 15 and 16, 2023.  DCFS and minor's counsel recommended the court terminate Patricia's parental rights and place Samuel for adoption with his foster parents, with whom Samuel had resided since September 30, 2019.

Prior to the hearing, Patricia requested a bonding study to have neutral experts examine the nature of the bond between Patricia and Samuel and opine whether it would be detrimental to Samuel to terminate the parent-child relationship.  Patricia's counsel requested Dr. Ronald Banks be appointed as an expert evaluator, and DCFS and Samuel's counsel recommended Ms. Nataly Valenzuela-Meza.  The court ultimately appointed both experts, who observed Patricia and Samuel interact on June 12, 2023, at the DCFS offices.  Ms. Valenzuela-Meza authored a report opining that termination of the parent-child relationship between Patricia and Samuel would not be detriment to Samuel.  Dr. Banks opined in his report that Patricia "appeared to have a poor bond with Samuel" and opined that "the harm of losing the relationship with his biological mother would be minimal, at best, and short lived."  DCFS submitted the two reports as exhibits for the section 366.26 hearing, among other documents.

Patricia requested two documents be admitted into evidence:  (1) her trial brief and (2) an audio recording of her June 12, 2023 visit with Samuel conducted for purposes of the

undertake to catalogue the evidence considered by the court in deciding that issue.

bonding study. The court admitted the trial brief and its exhibits and excluded the audio recording, as discussed below.

After conducting the section 366.26 hearing, the court concluded Patricia had not maintained consistent visitation with Samuel, and that Samuel would not suffer detriment if the parent-child relationship was severed. Thus, the court concluded the parental-benefit exception did not apply. The court terminated Patricia's parental rights and declared the foster parents the prospective adoptive parents.

### B.  Applicable law

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  The court must first determine whether the child is likely to be adopted.  (*Ibid.*) If so, and if a parent's reunification services have previously been terminated, "the court shall terminate parental rights to allow for adoption." (*Ibid.*)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan.  (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)" (*Caden C.*, at pp. 630-631.)  One such circumstance is the so-called parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  Patricia sought to prove this exception to adoption applied.[8]

"[T]he parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things.  The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover,

---

[8]     Patricia did not contest whether Samuel was adoptable.

the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.  (See § 366.26, subd. (c)(4)(A).)" (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

A parent has due process rights at the section 366.26 hearing.  (*In re J.S.* (2017) 10 Cal.App.5th 1071, 1081; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1068.)  "Due process during a dependency hearing generally requires that parents be given the right to present evidence, to cross-examine adversarial witnesses, and for counsel to be provided the opportunity to argue the merits of an issue." (*In re L.J.* (2023) 89 Cal.App.5th 741, 753-754 (*L.J.*).)  However, a parent only has the right to present " 'relevant evidence of significant probative value to the issue before the court.' " (*Ibid.*; accord, *In re J.S.*, at p. 1081.)

"Section 706 provides the court shall receive in evidence the social study of the children and such other relevant and material evidence as may be offered.  '[T]he provisions of Evidence Code section 352 (allowing the court to limit relevant evidence if it is cumulative, time wasting, or likely to confuse the issues) are necessarily implied in . . . section 706.' [Citation.]  'Trial courts are afforded discretion to work within existing guidelines to

22

determine the admissibility of evidence.' " (*L.J.*, *supra*, 89 Cal.App.5th at p. 751.)

" 'Ordinarily, parties have the right to testify in their own behalf [citation], and a party's opportunity to . . . proffer admissible evidence is central to having his or her day in court.' " (*Guardianship of A.H.* (2022) 83 Cal.App.5th 155, 159 (*A.H.*), quoting *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357 (*Elkins*).) "At the same time, however, ' "[i]t is . . . well established that courts have . . . inherent power to control litigation before them. [Citation.] . . . '. . . That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice. [Citation.]' " [Citation.]' (*Elkins*, [ ] at p. 1351.) 'The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence.' " (*A.H.*, at p. 159; see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 ["Courts have inherent power to control litigation before them."].) In dependency cases, courts are additionally charged with "control[ling] all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought." (§ 350, subd. (a)(1).)

Evidence Code section 766 provides, "A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." Courts may strike unresponsive and inadmissible answers on their own motion, as the responsibility of conducting the trial "regularly and expeditiously" rests on the judge. (*People v. Dad* (1921)

23

51 Cal.App. 182, 185-186; see *People v. Viray* (2005) 134 Cal.App.4th 1186, 1208 ["The court may of course exclude evidence on its own motion, but it will ordinarily do so only if it finds the evidence wasteful of judicial resources because, e.g., it is redundant or irrelevant."].)

"The trial court can exclude evidence—even when its purpose is to promote the interest in prompt and efficient trials— only if the exclusion is not arbitrary." (*A.H.*, *supra*, 83 Cal.App.5th at p. 160; see *People v. Gomez* (2018) 6 Cal.5th 243, 293 [although court has broad discretion to control the conduct of trial, "discretion must be exercised impartially in order to protect . . . constitutional rights to due process and to a fair trial"].) We review for abuse of discretion both a court's decision to exclude evidence and its exercise of its authority to control proceedings. (*L.J.*, *supra*, 89 Cal.App.5th at p. 751; *People ex rel. Reisig v. Acuna*, *supra*, 9 Cal.App.5th at pp. 23-24.) The nonarbitrary exercise of discretion to exclude evidence does not infringe a parent's due process rights. (See *In re Jordan R.* (2012) 205 Cal.App.4th 111, 133 [ordinary rules of evidence do not impermissibly infringe on parents' rights to present their case, and due process does not require the admission of all evidence which may tend to support parents' positions]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 969 ["Although a defendant has a ' "general [constitutional] right" ' to offer a defense through the testimony of his or her witnesses, a state court's exclusion of defense evidence under ordinary rules of evidence—including Evidence Code section 352—generally does not infringe upon this right."].) Thus, if we find the juvenile court did not abuse its discretion under the ordinary rules of evidence in excluding

24

evidence, we necessarily find no due process violation as a result of that exclusion.

### C. Patricia's due process rights were not violated

#### 1) *The court did not err in excluding the audio recording*

Patricia contends she was denied her due process right to introduce into evidence the audio recording of the visit between Patricia and Samuel that took place at the DCFS offices on June 12, 2023. Dr. Banks and Ms. Valenzuela-Meza had observed this visit, and they both relied on their observations to form their opinions that Samuel would not be detrimentally affected if Patricia's parental rights were terminated. Patricia had audio-recorded the session using her cellphone, and wanted the recording admitted into evidence at the section 366.26 hearing because she believed it would contradict the experts' conclusions.

When Patricia sought to admit the audio recording, DCFS objected and proffered evidence that Patricia made the partial recording of the confidential proceeding surreptitiously, without the permission of the other participants. DCFS submitted a photo of the reception window where visitors must sign in, showing a sign posted with large, bold words stating, "NO FILMING, VIDEOGRAPHY, PHOTOGRAPHY, OR RECORDING." Underneath, the sign states, "No filming, videography, photography, or recording (including audio . . .) . . . is permitted anywhere on the premises, including in the lobby."

The juvenile court concluded that Patricia secretly recorded the visit without the permission of the court-appointed evaluators or Samuel (by his counsel or by his foster parents whom the court

25

had designated as Samuel's de facto parents).  Based on the evidence submitted by DCFS that everyone who entered the DCFS building "clearly knew there were to be no types of recording," the court determined that both the evaluators and Samuel had a reasonable expectation of privacy.  Thus, pursuant to Penal Code section 632, the court found the recording was inadmissible in the juvenile court proceedings, including for impeachment purposes.[9]

Our colleagues in the Third Appellate District recently addressed a virtually identical issue in *L.J.*, *supra*, 89 Cal.App.5th 741.  In that case, the mother of the dependent minor at issue contended the juvenile court "violated her constitutional right to due process by excluding the audio/video recording she made of herself" visiting with the minor.  (*Id.* at p. 751.)  The mother claimed the exclusion of this evidence prevented her from meeting her burden to show the parental-benefit exception applied.  (*Ibid.*)

On appeal, the court in *L.J.* noted that "Penal Code section 632 expressly forbids the recording of confidential communications without the consent of all parties and makes such recordings inadmissible 'in any judicial, administrative, or other proceeding.'  For the purposes of Penal Code section 632, a confidential communication 'means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto,

---

[9]     Penal Code section 632 prohibits recording confidential communications and bars the admission of such unlawful recordings in judicial proceedings.  (Pen. Code, § 632, partially abrogated as to criminal proceedings, as stated in *People v. Guzman* (2019) 8 Cal.5th 673, 679-684.)

but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.' " (*L.J.*, *supra*, 89 Cal.App.5th at p. 752; see Pen. Code, § 632.)

The court held that the minor's counsel, not the parent, had the authority to consent to a recording on behalf of the minor in this setting, because in dependency proceedings, the minor's counsel serves as the minor's guardian ad litem. (*L.J.*, *supra*, 89 Cal.App.5th at p. 752.) Given there was a sign posted in the lobby stating the visits were not to be recorded, and the visit was held in a private visitation room, the court disagreed with the mother's assertion that there was no objectively reasonable expectation of privacy in the visit. (*Id.* at p. 753.) Thus, the court concluded the visits "qualified as confidential communications between mother and the minor" for purposes of Penal Code section 632. (*L.J.*, at p. 753.) The court determined the recordings were properly excluded, and that the mother's due process rights were not violated by their exclusion. (*Id.* at pp. 753-754.)

We likewise find no error or due process violation in Patricia's case based on the juvenile court's decision to exclude the audio recording of the bonding study visit. " 'A conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded.' " (*Mezger v. Bick* (2021) 66 Cal.App.5th 76, 89.) As in *L.J.*, the evidence demonstrates that all visitors to the DCFS offices were advised by a clear and conspicuous sign that recording was prohibited. Thus, we cannot accept Patricia's

27

unsupported contention that "there was no limitation to taking photos or videos and also audio recordings" at the bonding study visit, and that she was never told not to record. Neither Samuel's attorney (his guardian ad litem) nor his de facto parents consented to the recording. Therefore, the juvenile court correctly determined the recording by Patricia was unlawful under Penal Code section 632, and properly excluded it from evidence at the section 366.26 hearing.

### 2) *The court did not err in limiting Patricia's testimony*

Patricia also contends her due process rights were violated when the court struck her answer to the first question asked of her, and then did not allow any further testimony by her.

At the section 366.26 hearing that commenced on August 15, 2023, Patricia appeared remotely. When the court unmuted her to begin her testimony, Patricia immediately began interrupting the court and directing disrespectful comments to the court, including telling the court, "You're not following your own rules." The court gave Patricia repeated warnings that her testimony would not be permitted if she could not behave in a respectful way, cease making rude comments, and simply answer the questions asked by her attorney. The court several times struck Patricia's non-responsive answers to her counsel's question as to whether Patricia had maintained regular contact with Samuel (to address the first prong of the parental-benefit exception to adoption). After her answer was stricken the first time, Patricia told the court, "That is crazy. You know, you're going to be in trouble for that, Judge." When her attorney re-asked about her contact with Samuel, Patricia answered as follows:

"[Patricia]: I had my last visit June 12th during a bonding study. And my visit before that, 17 months earlier, on December 22nd, 2021. It is not due to my fault that I was not allowed visits. It's entirely due to the fault of the attorneys on this case, Pichvai [counsel for DCFS] who is a criminal, Ramey [counsel for Samuel] who is criminal, and you [Patricia's own counsel] are a criminal, and the judge is a criminal because you keep doing this over and over again where you're child trafficking of children that are healthy and normal to put them in the system, you know, completely destroy them, completely try to destroy the parents, and then actually give them away to people who are completely, completely inadequate and abusive and neglectful of children. That's what I'm going to say, and it's already out there. It's already out there in court. And you know what? I don't really care what anyone on this particular panel, if you want to call it that, says because all they do is lie."

The court struck her answer and, citing its "ability to operate its court in a judicious fashion," indicated it would not permit Patricia to provide any further testimony. The court explained, "I'm not not letting her testify. What I am not letting her do is to go off on a tirade like she just did, calling everyone including the court a criminal." The court noted it had given Patricia several warnings, but Patricia had refused to obey the court's directives. The court ruled that Patricia could submit a declaration answering her counsel's questions in lieu of live testimony. At Patricia's request, the court subsequently agreed to admit into evidence a lengthy declaration that Patricia had prepared to support a section 388 petition.

We find no abuse of discretion in the juvenile court's decision to strike Patricia's non-responsive answers during her

direct examination, and then to preclude further testimony after Patricia escalated her insulting and disrespectful language and called all the attorneys as well as the trial judge "criminals."[10] The record demonstrates that the juvenile court exercised patience and restraint in dealing with Patricia at this hearing and attempted to give her her day in court. But ensuring Patricia received due process did not require the court to allow her to berate the court or the attorneys and to waste the court's time with diatribes. (Cf. *A.H.*, *supra*, 83 Cal.App.5th at p. 162 [preventing party and sole witness from testifying as sanction for failure to provide witness list was abuse of discretion, where there was no "defiant or disrespectful behavior"].) The court had the authority, and an obligation, to exercise its inherent power to control the section 366.26 hearing in order to "insure the orderly administration of justice." (*Elkins*, *supra*, 41 Cal.4th at p. 1351; see § 350, subd. (a)(1).)

Further, the court allowed Patricia to submit a declaration that could include all the testimony she wished to use to meet her burden of proving the parental-benefit exception to adoption applied. While "[o]rdinarily, written testimony is substantially less valuable [than oral examination] for the purpose of evaluating credibility" (*Elkins*, *supra*, 41 Cal.4th at p. 1358), in this instance the juvenile court made a reasonable decision to allow Patricia to provide a declaration, given it had proven

---

[10] The first part of Patricia's answer, stating the dates of her last two visits with Samuel, was responsive to her attorney's question and thus should not have been stricken along with the non-responsive portions that followed. However, any error in striking this testimony was harmless because the information about Patricia's visits had already been introduced into evidence.

impossible for Patricia to provide oral testimony in an orderly and respectful fashion.

> 3) *Patricia did not receive ineffective assistance of counsel*

Patricia contends her due process rights were violated when she was not permitted to subpoena witnesses and propound discovery requests. Because she takes issue with the judgment calls made by her court-appointed lawyer, as opposed to any decision of the juvenile court, as Patricia acknowledged during her oral argument, her claim is more appropriately categorized as a claim for ineffective assistance of counsel.

Patricia contends her court-appointed attorney, Lakeshia Adeniyi-Dorsey (Dorsey), refused to subpoena witnesses and make discovery requests in preparation for the section 366.26 hearing. Patricia suggests she wished to subpoena DCFS caseworkers Lee and Castellano, minor's counsel's investigator Kovalsky (who attended Patricia's last visit with Samuel on December 21, 2021), and Samuel's foster parents. She also contends she wished to subpoena a 2021 report from Samuel's therapist but her attorney refused.

At the section 366.26 hearing, Dorsey told the court, "I have to call the witnesses that I think are relevant to the issues before the court today . . . that [Patricia] maintained regular contact with Samuel to the extent permitted by this court; that Samuel and her have a relationship that he would benefit from continuing to keeping that relationship . . . and then I have to prove that – by a preponderance of the evidence that termination of the relationship would impose a detriment to Samuel." Dorsey stated to this end she ultimately decided to call three witnesses: Patricia, Samuel, and Dr. Banks, one of the two bonding experts.

The court ruled that Patricia's counsel could call Patricia and Dr. Banks to testify.[11]  Ultimately, Dorsey did not call Dr. Banks to testify.

"A parent in a dependency proceeding is entitled to competent counsel and to judicial review of claims of ineffective assistance of counsel.  (See § 317.5; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1660.)  A parent seeking to establish ineffective assistance of counsel must show both that counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of dependency law, and that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*In re M.F.* (2022) 74 Cal.App.5th 86, 108-109; accord, *In re A.R.* (2021) 11 Cal.5th 234, 251-252.)  " 'Unless the record affirmatively establishes counsel had no rational tactical purpose for the challenged act or omission, we must affirm the judgment.' " (*In re N.S.* (2020) 55 Cal.App.5th 816, 843; see *In re M.F.*, at pp. 108-109 ["When a parent seeks to assert ineffective assistance of counsel on direct appeal (as opposed to by writ of habeas corpus), appellate courts . . . limit their review to consider only those claims ' "where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." ' "].)

---

[11]    Samuel's counsel and DCFS objected to Samuel being called as a witness as to whether he wished to be adopted, and the court determined Patricia could not call him, after weighing the probative value of Samuel's testimony against the likelihood of retraumatizing him by requiring him to testify on this subject. On appeal, Patricia does not contend the court violated her due process rights in ordering she could not call Samuel as a witness.

Patricia cannot show that Dorsey had "no rational tactical purpose" for not subpoenaing the witnesses Patricia wanted her to call or not propounding discovery requested by Patricia. Dorsey explained to the court that she determined that she would call only those witnesses whose testimony was relevant to the issues at the section 366.26 hearing—that is, whether Patricia maintained regular contact with Samuel and whether it would be detrimental to Samuel to no longer have a relationship with Patricia. It is thus apparent that Dorsey made the judgment call that the witnesses Patricia wished to call and the discovery Patricia wished to request would *not* be relevant to or favorably support Patricia's attempt to meet the requirements of the parental-benefit exception.

When a party is represented by professional counsel, " 'that counsel is "captain of the ship" and can make all but a few fundamental decisions for the [party].' " (*People v. Welch* (1999) 20 Cal.4th 701, 729.) The fact that Dorsey made tactical choices with which Patricia vehemently disagreed does not demonstrate that Dorsey's representation fell below the standard of care of a reasonably competent attorney practicing dependency law. Patricia has not demonstrated that she received ineffective assistance of counsel in connection with the section 366.26 hearing.

### 3. *Denial of Patricia's Section 388 Petition*

On June 6, 2022, Patricia filed a request under section 388 to have the juvenile court reinstate reunification services and visitation for Patricia, vacate the order setting the section 366.26 hearing, order Patricia's trial counsel to be relieved (an order repeatedly requested), and set a further six-month reunification hearing date. Patricia alleged that circumstances had changed

33

that justified a change in orders, because the Court of Appeal had issued an order to show cause and stayed the section 366.26 proceedings pending its decision on Patricia's petition for extraordinary writ challenging the juvenile court's order setting the section 366.26 hearing. Patricia noted our order specified that the Court of Appeal's stay "does not preclude the juvenile court from ordering additional family reunification services in the interim." Patricia asserted it was in Samuel's best interests to reunify with her.

On June 8, 2022, the juvenile court denied Patricia's section 388 petition without a hearing, concluding (1) the request did not state new evidence or a change of circumstances; (2) the proposed change of order did not promote the best interest of the child; and (3) the same matter was pending before the Court of Appeal and thus the juvenile court lacked jurisdiction to hear the matter until the appeal was resolved.

On November 14, 2022, this court denied Patricia's petition for extraordinary writ relief. (*In re Samuel A.*, *supra*, B316997, B317751, and B318877.) In denying the petition, this court found substantial evidence supported the juvenile court's decision terminating reunification services and "effectively affirm[ed] the juvenile court's finding that further visitation would be detrimental to Samuel." (*Id.* at p. *8.) The section 366.26 hearing went forward in the juvenile court on August 16, 2023, and Patricia's parental rights were terminated.

Thus, the purported change of circumstances relied on by Patricia as the basis for her June 6, 2022 section 388 petition— namely, that this court had stayed the section 366.26 hearing pending its decision on Patricia's petition for extraordinary writ challenging the juvenile court's order setting the section 366.26

34

hearing—no longer exists. Subsequent events have made it impossible for this court to afford Patricia effective relief on her section 388 petition. (See *In re D.P.* (2023) 14 Cal.5th 266, 276 ["A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' "].) Accordingly, Patricia's appeal from the denial of her section 388 petition is dismissed as moot. (See *In re N.S.* (2016) 245 Cal.App.4th 53, 58-59; *In re E.T.* (2013) 217 Cal.App.4th 426, 436.)

### ***DISPOSITION***

The order granting the restraining order is affirmed as modified. Paragraph 10 of the restraining order filed on September 16, 2022, is modified to state that Patricia may "not post or cause to be posted any postings, messages, comments, photographs, videos, or other information pertaining to the foster parents, or either of them, on any social media account," and "not post or cause to be posted on social media any likenesses of Samuel A. (either photographs or videos), or any references to Samuel's full name, location, school, or specific identifying information, or any information related to the confidential juvenile case file involving Samuel." In all other respects, the order granting the restraining order is affirmed. The juvenile court is directed to enter the restraining order as modified.

/ / /

/ / /

35

The court's order terminating Patricia's parental rights is affirmed. The appeal from the June 6, 2022 order denying Patricia's section 388 petition is dismissed as moot.

                                        STONE, J.

We concur:


            SEGAL, Acting P. J.


            FEUER, J.